1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COZUMEL LEASING, LLC,

               Plaintiff,

    v.

INTERNATIONAL JETS INC., a
Washington corporation, DAVID
KILCUP, an individual, ALDEN
ANDRE, an individual, and AIRCRAFT
SOLUTIONS LLC, a Washington
limited liability company,

               Defendant.

CASE NO. 16-5089 RJB

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

     This matter comes before the Court on Defendant Aircraft Solutions, LLC ("Aircraft

Solutions") Renewed Motion for Summary Judgment (Dkt. 101), Defendant David Kilcup and

International Jets, Inc.'s ("International Jets") Motion for Summary Judgment (Dkt. 107) and

motion to strike (Dkt. 136), Alden Andre's Motion for Summary Judgment (Dkt. 110) and

Plaintiff's Motion for Partial Summary Judgment (Dkt. 112). The Court has considered the

pleadings filed in support of and in opposition to the motions and the file herein. Oral argument

was requested, but is not necessary to decide the motions.

1    This case arises out of Plaintiff's purchase of a 1977 Cessna Citation ISP ("aircraft")

2    from International Jets that Plaintiff asserts was not airworthy and required thousands of dollars

3    to repair.  Dkts. 1 and 48.  The parties now move for summary judgment.  For the reasons

4    provided below, Plaintiff's motion for summary judgment (Dkt. 112) should be denied;

5    Defendant Andre's motion for summary judgment (Dkt. 110) should be granted; and the

6    remaining Defendants' motions (Dkts. 101 and 107) should be granted, in part, and denied, in

7    part.

8         As is relevant to this motion, the Federal Aviation Administration ("FAA") defines

9    "airworthy" as meaning that an "aircraft conforms to its type design and is in a condition for safe

10   operation." 14 C.R.F. § 3.5 (a).  The regulations further state that: "[n]o person may operate a

11   civil aircraft unless it is in an airworthy condition," and that "[t]he pilot in command of a civil

12   aircraft is responsible for determining whether that aircraft is in condition for a safe flight.  The

13   pilot in command shall discontinue the flight when unairworthy mechanical, electrical, or

14   structural conditions occur."  14 C.F.R.  §91.7 (a)-(b).

15                         I.    **FACTS**

16        Prior to the events that gave rise to this case, the aircraft was owned by VonJett, Inc.

17   ("VonJett") and leased to another company, American Care Aviation.  Dkts. 113-4, at 38 and

18   113-6, at 55.  Defendant Alden Andre was the director of maintenance for the aircraft (along

19   with other aircraft) under a contract with American Care Air. Dkt. 113-6, at 55-56. (An aircraft

20   director of maintenance monitors the extensive maintenance and regulation requirements for an

21   aircraft, and arranges for repairs and inspections.  Dkt. 113-11, at 3.)  Andre also had a contract

22   with Defendant Aircraft Solutions, an aircraft repair company, to be an aircraft maintenance

23

24

sales representative for it; he received monthly compensation plus commission on work he acquired for the shop. Dkts. 111, at 46; 113-6, at 117-118 and 113-7, at 15.

Sometime before the summer of 2013, at the recommendation of Andre, VonJett hired Defendant International Jets (its president is Defendant David Kilcup) to sell the aircraft. Dkts. 113-5, at 42 and 113-7, at 21. (Andre was not employed by International Jets, but did receive a referral commission from International Jest on the eventual sale of the aircraft. Dkt.113-4, at 139-141.) In August or September of 2013, VonJett repossessed the aircraft from American Care Aviation for failure to make payments under the lease agreement. Dkt. 113-4, at 77. The aircraft was flown to Aircraft Solutions in Spokane, Washington. Dkt. 113-4, at 79.

In September of 2013, International Jets began advertising the sale of the aircraft. Dkt. 113-4, at 38. Kilcup was not aware of any maintenance due on the aircraft until Andre informed Kilcup that in October it would be due for a Phase V inspection. Dkt. 113-4, at 79.

A Phase V inspection is performed on this type of jet aircraft every 1,200 hours or 36 months of flight, whichever comes first. Dkt. 113-1, at 51. While it is a very extensive review of many of the major systems and airframe, it does not require inspection of all aspects of the aircraft (particularly the engines). Dkt. 113-8, at 38-39. It is done while the aircraft is on the ground. Dkt. 113-1, at 139.

Around September 17, 2013, Dr. David Fallang contacted Kilcup about purchasing the jet aircraft. Dkt. 113-9, at 31-32. Fallang is the sole "representative" of Plaintiff Cozumel Leasing, LLC ("Cozumel"); the owner of Cozumel is the Fallang Family Limited Partnership and Cozumel was formed to hold aircraft. Dkt. 113-9, at 137; 108, at 25. Fallang is a pilot and owned two other aircraft at the time, but neither were jets. Dkt. 113-9, at 7-8. He is a retired

physician, and owns two other businesses: a for-profit hospital and a waste heat recovery

business. Dkt. 113-9, at 10-11.

In any event, during their initial conversation, Fallang states that Kilcup told him that jet

aircraft have phase inspections rather than annual inspections. Dkt. 113-9, at 33. Fallang

testified that he did not know the inspection schedules of jet aircraft at that time. Dkt. 113-9, at

33. Fallang states that Kilcup told him that the aircraft had recently undergone Phase I-IV

inspections and was shortly due for a Phase V inspection, which was a "very extensive

inspection of all the major systems." Dkt. 113-9, at 35.

In September of 2013, Kilcup sent Fallang a Letter of Intent ("LOI"). Dkt. 113-19, at 1.

The LOI provides that the aircraft was to be purchased for $1,430,000 subject, in part, to the

following: "1) Aircraft is to be delivered in an airworthy condition, no damage history,

represented per the information received, current on its inspection program, and with a clear and

unencumbered title. 2) A satisfactory pre-purchase inspection is to be completed at buyer's

expense . . ." *Id.* The LOI also provides:

**<u>DISCLAIMER</u>**

BUYER REALIZES THAT THE AIRCRAFT IS USED, AND BUYER
AGREES THAT THE AIRCRAFT IS PURCHASED "AS IS" TO THE EXTENT
ALLOWED BY APPLICABLE LAW, (I) SELLER MAKES NO
WARRANTIES, (II) BUYER WAIVES AS TO SELLER ALL WARRANTIES,
WHETHER AS TO MERCHANTABILITY, FITNESS, OR OTHERWISE, AND
(III) BUYER AGREES THAT SELLER SHALL NOT BE LIABLE FOR ANY
GENERAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES,
INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR LOSS OF
USE OR LOSS OF PROFITS, OR ANY DAMAGES CLAIMED BY THE
BUYER OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF
NEGLIGENCE OR STRICT LIABILITY IN TORT.

*Id.* (*emphasis in original*). Fallang signed the LOI on behalf of Cozumel on September 21, 2013

and Kilcup signed for International Jets on September 23, 2013. *Id.*

1        Around this time, Kilcup told Fallang that he could save money on the pre-buy inspection

2 if he just combined it with the Phase V inspection. Dkts. 113-9, at 56 and 113-4, at 87 and 91.

3 Kilcup assured Fallang "that a Phase 5 [inspection] would be an adequate pre-buy" inspection.

4 Dkts. 113-9, at 116 and 113-4, at 93.  (Fallang did not pay for pre-buy inspections on his other

5 two aircraft because other potential purchasers had already done them and the inspections were

6 still timely.  Dkt. 113-9, at 56.)  Unlike the Phase V inspection, there is no set way to do a pre-

7 buy inspection; what buyers choose to do varies widely - from a simple walk around the airplane

8 to a check of everything.  Dkt. 113-4, at 51-53.

9        On or around October 10, 2013, Fallang states that Kilcup suggested that the Phase V

10 inspection "etc." be completed by Defendant Aircraft Solutions.  Dkt. 113-9, at 53-54 and 60-61.

11 Fallang agreed. Dkt. 113-9, at 61.  Aircraft Solutions had a repair station certificate for Citation

12 500 series aircraft, like the one here.  Dkt. 102-6, at 6.  Kilcup and Fallang knew that VonJett, as

13 the owner, was responsible to pay for the Phase V inspection and for any repairs that were

14 needed as a result of the inspection.  Dkt. 113-5, at 32-33.

15        Arrangements were made, and Aircraft Solutions started the inspection.  Dkt. 113-5, at

16 27.  Kilcup asserts that he told Andre and Charlie Archer, Aircraft Solutions' General Manager,

17 that the aircraft was being sold and that the Phase V inspection was to serve as the pre-buy

18 inspection.  Dkt. 113-4, at 128-129, 131.  Kilcup states that he told Floyd Larson, Aircraft

19 Solution's Director of Maintenance, (either directly or indirectly) the same thing.  Dkt. 113-4, at

20 131.  Andre maintains that Aircraft Solutions knew they were performing both a Phase V

21 inspection and a pre-buy inspection.  Dkt. 113-7, at 13-15.  Archer (Aircraft Solution's corporate

22 representative for this lawsuit) states that Aircraft Solutions did not know the Phase V inspection

23 was to be used as the pre-buy inspection.  Dkt. 113-2, at 81 and 83.  Larson states that Andre told

24

1 him the aircraft was being sold at the time the Phase V inspection was scheduled, but not to

2 whom.  Dkt. 113-3, at 84-86.

3   Aircraft Solutions mechanic Peter Reed, who worked on the aircraft, claims that a Phase

4 V inspection does not require a review of the log books; he maintains that ordinarily the log

5 books are reviewed in a pre-purchase inspection.  Dkt. 113-1, at 55 and 71.  Kilcup (who is not a

6 mechanic) asserts that the log books are to be reviewed in a Phase V inspection.  Dkts. 113-4, at

7 59 and 113-5, at 24.  Andre, who is a mechanic, states that the log books should be reviewed as a

8 part of a pre-buy inspection.  Dkt. 113-7, at 13-15.

9   In early October 2013, Kilcup and Fallang began negotiating the sales contact, which

10 although originally drafted by Kilcup, included changes by Fallang.  Dkt. 108, at 15-16.  On

11 October 14, 2013, Cozumel (through Fallang) and International Jets (through Kilcup) entered an

12 "Aircraft Sales Agreement" ("Sales Agreement").  Dkt. 113-20.  The Sales Agreement provides,

13 in relevant part:

14    PURCHASER agrees to pay SELLER the total purchase price of $1,430,000.00
USD. The PURCHASER will expect the aircraft to be delivered in an airworthy
15    condition with no damage history, with all systems operating normally, all
Airworthiness Directives and Mandatory Service Bulletins complied with and all
16    logbooks in the SELLER's possession. The PURCHASER, at the PURCHASER'S
expense will perform a pre-purchase inspection at a location acceptable to both
17    parties. The SELLER will remedy all airworthy discrepancies.  An airworthy
discrepancy is defined as any item discovered during the pre-purchase inspection
18    and included in the Inspection Report which the Inspection Facility deems to
render the Aircraft unairworthy and necessary to be corrected to render the
19    Aircraft airworthy.  If at any point during pre-purchase inspection the cost of
AIRWORTHY discrepancies exceeds $25,000.00 the Seller has the right to
20    terminate this sale and refund the PURCHASER for all the PURCHASER'S out
of pocket expenses incurred during the pre-purchase inspection and repositioning
21    of the aircraft. Should the aggregate cost of NON-AIRWORTHY discrepancies
exceed $25,000.00 the PURCHASER has the right to terminate this sale and
22    receive a refund of their deposit from the Escrow Company unless SELLER
agrees to correct those NON- AIRWORTHY items at SELLER's expense.  The
23    PURCHASER will place a fully refundable deposit in the amount of $50,000.00
at JetStream Escrow and Title Service. The deposit will become non-refundable

24

upon receipt of the signed Visual Acceptance Certificate in the form of Exhibit B hereto attached following SELLER's visual inspection of the Aircraft at Spokane, Washington and a demonstration test flight in the Aircraft. The deposit is non-refundable subject only to the performance of the parties under the terms and conditions of this Agreement. The Balance due and payable at time of closing/delivery of said Aircraft in the amount of $1,380,000.00 USD.

Dkt. 113-20, at 1 (*emphasis in original*). It also provides:

> THE AIRCRAFT IS BEING SOLD ON AN AS IS BASIS, AND THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DECRIPTION OF THE AIRCRAFT. Seller disclaims all express or implied warranties or representations of any kind or nature whatsoever including merchantability and fitness except that Seller warrants that the Aircraft will be delivered with the appropriate Bill of Sale and all other title documents.

*Id.,* at 2 (*emphasis in original*). The Sales Agreement further states, "Purchaser warrants the terms and conditions of this Sales Agreement were fully read and understood and that they constitute the entire agreement between the parties. There are no other agreements written or oral which pertain to the sale of the Aircraft." *Id.,* at 3.

Exhibit D to the Sales Agreement, entitled "Aircraft Warranty Bill of Sale," includes only a signature line for International Jets, and was signed on November 21, 2013. Dkt. 113-20, at 10-11. This document provides, in part:

> Other than the warranties of title and the absence of liens or encumbrances expressly set forth in the Agreement or in this Warranty Aircraft Bill of Sale, the Aircraft and Aircraft Documentation is being sold on a strict "AS IS, WHERE IS" basis and without recourse or warranty. SELLER HEREBY DISCLAIMS ALL WARRANTIES RELATING TO THE AIRCRAFT AND THE AIRCRAFT DOCUMENTATION, AND PURCHASER AGREES THAT IT ACQUIRED THE AIRCRAFT AND THE AIRCRAFT DOCUMENTATION FROM SELLER ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS. WITHOUT LIMITING THE GENERALALITY OF THE FOREGOING, PURCHASER HEREBY RELEASES, RENOUNCES AND DISCLAIMS (a) ANY WARRANTY AS TO THE AIRWORTHINESS OR CONDITION OF THE AIRCRAFT; (b) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS; (c) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE; (d) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM THE ACTUAL OR IMPUTED

NEGLIGENCE OF SELLER; AND (e) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY FOR LOSS OF OR DAMAGE TO ANY TANGIBLE OR INTANGIBLE THING, FOR LOSS OF USE, REVENUE OR PROFIT, OR ANY OTHER DIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

*Id.* (*emphasis in original*).

Around October 21, 2013, Fallang traveled to Spokane, Washington for a demonstration flight of the aircraft. Dkts. 113-9, at 34 and 113-21. Ben Hoffman was the pilot. Dkt. 113-9, at 44. According to Fallang, they went to around 14,000 or 16,000 feet, flew around for about 18 minutes, landed at Felt Field and had lunch. Dkt. 113-9, at 46-48. During his deposition, Fallang acknowledged that they would need supplemental oxygen in an unpressurized airplane above 12,500 feet. Dkt. 113-9, at 48. Fallang further testified that they did not use supplemental oxygen on this demonstration flight; so, the pressurization system worked as far as he could tell. Dkt. 113-9, at 46-47. After lunch, they had difficulty getting the aircraft to start. Dkt. 113-9, at 48-49. On inspection, they noticed a frayed battery cable. Dkt. 113-9, at 51. Fallang asserts that Kilcup "assured [him] that that was . . . nothing serious" and the "upcoming Phase V pre-buy would find any other issues that would affect airworthiness." Dkt. 113-9, at 51. Fallang acknowledges that Kilcup did not tell him that the Phase V pre-buy would be an inspection of every component of the aircraft. Dkt. 113-9, at 51-52.

Aircraft Solution's Larson supervised the entire Phase V inspection on the aircraft. Dkt. 113-1, at 68. They used the checklist created by Cessna that completely outlines the Phase V inspection requirements. Dkt. 113-1, at 54-57. They knew what maintenance the jet needed based on items that came up on the checklist and by following the maintenance manual. Dkt. 113-1, at 56. Mechanic Reed, who performed portions of the Phase V inspection, and other mechanics, ordinarily initialed by the items they completed or inspected. Dkt. 113-1, at 54.

1   Although not every item on the Phase V checklist was initialed as completed, Archer states that

2   Aircraft Solutions did do every item because it was reflected on the work orders; when asked

3   about the particulars, he was not sure why certain items had not been initialed.  Dkt. 113-2, at

4   118-121.

5        Andre did not perform any of the Phase V inspection.  Dkt. 113-6, at 177.  He was

6   involved only with the borescope of the engines (which was not a part of the Phase V).  Dkt.

7   113-6, at 177 and 195.  He also acquired a part for the landing gear with which Aircraft Solutions

8   used to repair the aircraft.  Dkt. 113-6, at 134.

9        Fallang was still interested in purchasing the aircraft after the demonstration flight, and

10  did not attempt to unwind the deal at that point.  Dkt. 113-9, at 52.  On October 24, 2013, Fallang

11  executed the Visual Acceptance Certificate even though the Phase V inspection was not

12  complete.  Dkts. 113-9, at 78-79 and 113-20, at 8.  Later that day, Kilcup emailed Fallang, and

13  told him that he would contact Larson and Andre and ask what happened to the engines on the

14  demonstration flight.  Dkt. 113-22, at 1.  Kilcup's email further provided:

15          I'll shoot you a note later on today after speaking with Floyd and assure you the
            little things they find along the way (table fixes included) will be addressed at no
16          expense to you. When it comes out of a Phase 5 things are fixed properly and it'll
            be a terrific vehicle . . .
17
    Dkt. 113-22, at 1.
18
            On November 1, 2013, Larson emailed Kilcup, with a subject line "Phase 5 Pre-buy
19
    Inspection;" Larson indicated that the inspection was around 60% completed, and listed the
20
    discrepancies found on the aircraft to that point  Dkt. 113-4, at 234-235.  On November 5, 2013,
21
    Kilcup told Fallang that the Phase V inspection was close to complete and that he had approved
22
    repair of all airworthy maintenance deficiencies, including replacement of a main landing gear
23
    actuator due to a leak.  Dkt. 113-9, at 115-117.
24

After completion of the Phase V inspection, Larson at Aircraft Solutions completed the official "Maintenance Transcript Report," certifying "that [Aircraft Solutions] had completed the Phase V inspection and that the aircraft was airworthy, to [their] knowledge." Dkts. 102-6, at 12; and 113-2, at 75-76 and 105-106. Larson states that at the time the inspection was completed, the aircraft had no fuel leaks, he checked all systems, including the pressurization system, and all were operational. Dkt. 113-2, at 170 and 211-214.

On November 21, 2013, Fallang testified he met with Kilcup and Andre at the Spokane International Airport to take delivery of the aircraft. Dkt. 113-9, at 89. Fallang, his wife, Kilcup and Jeff Schreiber, the pilot, intended to fly the aircraft to Bozeman, Montana to close the sale. Dkt. 113-9, at 90.

Fallang recalls that Andre told him that only one wing needed to be inspected during the Phase V inspection, and that the "left side gear cylinder, actuator, or something like that, had been inspected, and was faulty and was replaced." Dkt. 113-9, at 97. Fallang asserts that Andre also mentioned that he might be available to be the aircraft's director of maintenance, but Fallang doesn't remember much of the conversation. Dkt. 113-9, at 98-99. Fallang had the impression that Andre was either an employee of Aircraft Solutions or was substantially involved with it. Dkt. 113-9, at 99. Andre remembers talking to Fallang "for a while," but he was busy with another airplane's paperwork at that point in time. Dkt. 111, at 23. Andre states he answered some of Fallang's questions about the aircraft, "like [Fallang] was talking about the tables and stuff, could they fix the slides in them or something like that." Dkt. 111, at 23. In a declaration filed in opposition to a March 2, 2017 motion for summary judgment (which was stricken so the parties could conduct further discovery) (Dkts. 62 and 82), Fallang asserts that Andre told him that "Aircraft Solutions' Phase V inspection resolved all airworthy discrepancies and that the

aircraft was in airworthy condition." Dkt. 73, at 3.  Other than this interaction, Fallang thinks

that he and Andre may have spoken on the phone "once or twice" but doesn't remember.  Dkt.

113-9, at 98.  Andre has no recollection of a phone conversation with Fallang.  Dkt. 111, at 25.

The pilot, Schreiber, did a pre-flight inspection of the aircraft.  Dkt. 109, at 2.  He walked

around the aircraft and did not see, or smell, any fuel.  Dkt. 109, at 2.  Using the checklist

approved by the FAA and Cessna, he also checked the aircraft's systems to determine whether

the aircraft was airworthy before they took off.  Dkt. 109, at 2.  Schreiber states that all systems

were operating normally and that the aircraft was airworthy.  Dkt. 109, at 2.  Fallang, his wife,

Kilcup, and pilot Schreiber, boarded the aircraft for the delivery flight to Bozeman.  Dkt. 113-9,

at 95.

While in flight, Schreiber noticed that the aircraft pressurized faster than he anticipated

and mentioned this to the passengers.  Dkts. 113-9, at 101 and 109, at 2. (Schreiber is also a

mechanic and has substantial experience maintaining Cessna Citations like the aircraft at issue

here.  Dkt. 109, at 1).  Schreiber flew over 12,500 feet, no one on board used supplemental

oxygen, and they did not declare an emergency.  Dkt. 113-9, at 101-104.  Kilcup got up, and

approached Schreiber about the pressurization issue; Schreiber told him "yeah, I can handle it;"

Schreiber determined that the aircraft was still safe to fly, not only to Montana but to Florida, as

Fallang planned.  Dkts. 113-5, at 87; and 109, at 2.  According to pilot Schreiber, on "landing,

the aircraft de-pressurized completely, with the pressurization (WOW weight on wheels) safety

systems working properly."  Dkt. 109, at 3.  Fallang states that Kilcup told him, while they were

on the ground in Bozeman, that "they would have this problem repaired at their expense."  Dkt.

113-9, at 105.

1    While they were in Bozeman, Kilcup asserts that he called Aircraft Solutions and told

2    them there was a problem with the pressurization system.  Dkt. 113-5, at 87.  Andre states that

3    Kilcup talked with him and Larson on a speaker phone in Larson's office about it.  Dkt. 113-7, at

4    42-43. Larson asserts he doesn't remember being on the phone, but that he told Andre to tell

5    them to turn the aircraft around and let Aircraft Solutions try to troubleshoot the problem.  Dkt.

6    113-3, at 110 and 222.  Kilcup denies anyone told them to return the aircraft to Aircraft

7    Solutions.  Dkt. 113-5, at 88.  According to Fallang, Kilcup called Naples Jet Center in Florida to

8    arrange for repairs and assured Fallang that the pressurization problem would be fixed.  Dkt.

9    113-9, at 105.

10    Cozumel did not rescind the Sales Agreement; Fallang states that he was not a trained

11    pilot in this aircraft, didn't really understand what the problem was or whether the problem made

12    the plane un-airworthy, and so did not realize that he could avoid the sale without losing his

13    deposit.  Dkt. 113-9, at 105-106.  Cozumel accepted delivery of the aircraft.  *Id.*  Fallang did not

14    notice any fuel leaking out of either wing prior to the time he took delivery of the aircraft.  Dkt.

15    113-9, at 126.

16    While they were on the ground in Montana, International Jets purchased the aircraft from

17    the prior owner VonJett.  Dkt. 113-4, at 38.  In a "back to back" sales transaction, International

18    Jets then immediately sold the aircraft to Cozumel.  *Id.*  As they were eating lunch and finalizing

19    the paperwork, the aircraft was filled with fuel.  Dkt. 109, at 3.  After all the documents were

20    signed, Schreiber did another pre-flight inspection of the aircraft; which included walking around

21    it.  Dkt. 109, at 3. He did not detect any fuel leaks.  Dkt. 109, at 3.  Fallang, his wife and

22    Schreiber then flew the aircraft to Naples, Florida.  Dkt. 113-9, at 108.  They stopped in

23    Mississippi to refuel.  Dkt. 113-9, at 3.  Although the pressurization problem continued,

24

Schreiber felt that the aircraft was safe - they flew over 12,500 feet and did not need supplemental oxygen. Dkts. 113-9, at 108-109; and 109, at 3. Schreiber states that he did not determine, at any point, that the aircraft was not airworthy. Dkt. 109, at 3.

On November 26, 2013, Fallang and pilot Ben Hoffman attempted to fly the aircraft. Dkt. 136, at 3. According to Fallang, "as soon as [they] left the ground the pressurization system failed to operate normally again." Dkt. 136, at 3. Fallang states that Hoffman "advised me that it was not safe to operate the aircraft with the pressurization system malfunctioning i.e. it was not airworthy." Hoffman grounded the aircraft. Dkt. 136, at 3.

Naples Jet Center began repairs; they worked on the pressurization system, but were unable to repair it. Dkt. 113-9, at 127-128. In addition to the issues with the pressurization system, Naples Jet Center told Fallang it found problems with various fittings and mounds of sealant on connections. Dkt. 113-9, at 127-128. Further, Naples Jet Center informed Fallang that Aircraft Solutions used screws that were too long when they reinstalled the leading edge of the right wing, the screws pierced a fuel tank and caused a leak which soaked a high current wiring bundle. Dkts. 73, at 4 and 113-9, at 130-131. They also asserted that there were issues with the other wing. *Id*. Fallang maintains that there was an additional x-ray inspection that was overdue. Dkt. 73, at 5. According to Plaintiff's expert, Donald Sommer, these issues made the aircraft unairworthy. Dkt. 113-12, at 4-6.

While at the Naples Jet Center hanger, watching fuel drip from the aircraft, Fallang states he called both Kilcup and Andre and told them about the fuel leak. Dkt. 113-9, at 134. Andre denies ever talking to Fallang after the sale was completed. Dkt. 111, at 30. Fallang asserts that "one of the two of them said that they would pay to have it repaired." Dkt. 113-9, at 134. Aside from paying for a $1,300 pressure control valve that was sent to Naples Jet Center, Andre denies

paying for, or offering to pay for, repairs. Dkts. 111, at 30 and 113-5, at 105. Fallang states that

he also talked with Larson, and Larson "admitted to [Fallang] that their mechanics should not

have placed improperly sized screws into these openings." Dkt. 113-9, at 135.

According to Fallang, Kilcup again assured him that the aircraft "would be fixed and we

would pay for it." Dkt. 113-9, at 133-134. Fallang acknowledges that he did not have any direct

discussions with anyone at Aircraft Solutions about Aircraft Solutions paying for any of the

repairs. Dkt. 113-9, at 199. He states that "all that came through Kilcup." Dkt. 113-9, at 199.

On December 23, 2013, Kilcup emailed Fallang and told him that Aircraft Solutions

would pay for the repairs to the pressurization system and right wing leak. Dkt. 113-5, at 120-

121. Kilcup also wrote that "[t]he left-hand wing, if it meets Cessna's definition of a leak, would

probably need to be included in that, but [Naples Jet Center] would need to communicate this

information to/with Floyd [Larson] and Alden [Andre]." Dkt. 113-5, at 121. Kilcup states that

in late December of 2013, Archer from Aircraft Solutions told him it would pay for those repairs.

Dkt. 113-5, at 124. Andre also asserts that Archer told him that Aircraft Solutions would pay to

fix the pressurization issues and the right wing leak. Dkt. 113-7, at 79 and 83-84. Larson states

that he did not ever offer for Aircraft Solutions to pay for repairs; that was up to Archer. Dkt.

113-3, at 123. Archer asserts that Aircraft Solutions did not agree, at any time, to pay for repairs

on the aircraft. Dkt. 113-2, at 140.

Mechanic Reed testified that he was told that Naples Jet Center replaced an air pressure

controller and solenoid. Dkt. 113-1, at 94-96. Reed states that a properly performed Phase V

should have discovered defective air pressure controllers or defective solenoids. Dkt. 113-1, at

95-97. Reed testified that the maintenance manual allows testing of only one wing and fuel

storage area (which is in the wing) each time a Phase V inspections is conducted; the Cessna

check list requires that both wings and fuel storage areas be inspected. Dkt. 113-1, at 107-108. Aircraft Solutions only inspected one wing of the aircraft. Dkt. 113-1, at 106.

By January 10, 2014, Naples Jet Center informed Fallang that it had the aircraft repaired and ready for delivery. Dkt. 113-9, at 153. Naples Jet Center forwarded its bill to Defendants, but would not release the aircraft until the bill was paid. Dkt. 113-9, at 154.

On January 21, 2014, Kilcup emailed Archer to discuss the bill from Naples Jet Center for repairs on the aircraft. Dkt. 113-27, at 1. In the email, Kilcup states that his "understanding was [Aircraft Solutions] would pay to rectify these issues (per Alden Andre who said he had a meeting with you on the subject)." Dkt. 113-27, at 1. Kilcup also discussed various items on the invoice including charges for repairs to the pressurization system and to repair the fuel leak. *Id.* Kilcup offered to pay for some of the charges. *Id.*

Archer testified that Andre was not an employee of Aircraft Solutions, was "not an agent or representative" and was "never vested with any authority whatsoever to speak or act on behalf of Aircraft Solutions." Dkt. 113-2, at 138. Archer denies that he and Andre ever met regarding the repairs. Dkt. 113-2, at 154.

On January 23, 2014, Fallang took the plane for a test flight, but the pressurization problem persisted. Dkt. 113-28, at 1. Fallang emailed Kilcup, Andre, Larson, and Naples Jet Center and told them. Dkt. 113-28, at 1.

Cozumel paid the bills from Naples Jet Center so it would release the aircraft. Dkt. 113-9, at 136-137. In February 2014, Cozumel moved the aircraft to Total Aero Services for repairs; and then in early March 2014 moved it to Orlando Citation Service Center, who found more repairs that were needed. Dkt. 113-9, at 129 and 158.

By mid to late March of 2014, the aircraft was repaired and Fallang was able to fly it from his home in Florida to his home in Ohio.  Dkt. 113-9, at 146.  Fallang used the aircraft for personal use only until 2016, and now uses the aircraft 30-40% of the time for business and the rest of the time he uses it to transport himself and his family.  Dkt. 113-9, at 15.

After voluntarily dismissing some claims with prejudice (Dkt. 118), Cozumel makes claims in its Amended Complaint for: (1) negligent misrepresentation against all Defendants; (2) violation of the Washington Consumer Protection Act ("CPA") against all Defendants, (3) negligence against Aircraft Solutions; (4) breach of contract against International Jet, (5) breach of express and implied warranties against International Jet and Kilcup, (6) breach of fiduciary duty against International Jet and Kilcup, and (7) fraud and fraudulent inducement against International Jet and Kilcup.  Dkt. 48.  Cozumel seeks damages, costs, and attorney's fees.  *Id.*

**Organization of Opinion**

In addition to the cross motions for summary judgment, Defendants Kilcup and International Jets move to strike certain testimony.  The Court will first consider the motion to strike, and then the cross motions for summary judgment by claim.

## II.     DISCUSSION

Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity jurisdiction, as is the case here, apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

### A.  DEFENDANT KILCUP AND INTERNATIONAL JETS' MOTION TO STRIKE

Kilcup and International Jets move to strike, as inadmissible hearsay, Fallang's statement that on November 26, 2013, pilot Ben Hoffman, after attempted to fly the aircraft, "advised [Fallang] that it was not safe to operate the aircraft with the pressurization system malfunctioning i.e. it

was not airworthy." Dkt. 136. Plaintiff asserts that this statement is admissible under the present sense impression exception under Fed. R. Ev. 803 (1). Dkt. 153. For purposes of this motion alone, this statement will be considered.

Kilcup and International Jets also move to strike portions of Plaintiff's expert Sommer's declaration for lack of personal knowledge and because it conflicts with prior testimony. While these issues may impact Sommer's credibility, it is sufficient for purposes of these motions. This ruling is for purposes of the present motions alone. Kilcup and International Jets' motion to strike (Dkt. 136) should be denied without prejudice.

**B. STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## C. CLAIMS FOR NEGLIGENT MISREPRESENTATION – ASSERTED AGAINST ALL DEFENDANTS

In Washington,

> A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that: (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

*Ross v. Kirner*, 162 Wn.2d 493, 499 (2007).

    1.    Defendant Andre's Motion for Summary Dismissal of the Negligent Misrepresentation Claim asserted against Andre

Plaintiff's claim against Andre for negligent misrepresentation should be dismissed. Even viewing the evidence in a light most favorable to Plaintiff, it fails to make any showing on the third factor, that Andre was "negligent in obtaining or communicating" to Plaintiff that the discrepancies had been repaired and the aircraft was airworthy. There is no evidence that Andre

should have questioned Aircraft Solutions' Director of Maintenance Larson's certification that

(1) Aircraft Solutions had completed the Phase V inspection and (2) "that the aircraft was

airworthy." (Dkt. 113-2, at 75-76 and 105-106). Plaintiff asserts that Andre was the past

maintenance director so should have known about the pressurization issues, but fails to note that

Andre thought they had been repaired; Plaintiff maintains that Andre was present for 90% of the

inspection, but fails to note that Andre was present in the facility, but did not do any of the

inspection work except work on the engines, which were not faulty. It points out that Andre

ordered a part and was copied on emails about the progress of the inspections. None of this

demonstrates that Andre was "negligent in obtaining or communicating" to Fallang that the

discrepancies had been repaired and the aircraft was airworthy. Fallang fails to point to any

other representations Andre made to him in furtherance of the sale; Fallang asserts that others

made representations, but fails to show that **Andre** made those representations. Andre's motion

to summarily dismiss the negligent misrepresentation claim should be granted and Plaintiff's

negligent misrepresentation claim against Andre should be dismissed.

> 2. Aircraft Solutions' Motion for Summary Dismissal of Negligent
>    Misrepresentation Claim

Aircraft Solution's motion for summary dismissal of Plaintiff's claim for negligent

misrepresentation (Dkt. 101) should be denied. There are several genuine issues of material fact

as to this claim.

There are issues of fact as to whether Andre was an apparent agent for Aircraft Solutions

when he allegedly told Fallang that "Aircraft Solutions' Phase V inspection resolved all

airworthy discrepancies and that the aircraft was in airworthy condition."

There are issues of fact as to the first element - whether the statement was true. Parties

seem to agree on the second element – Andre knew that the "information was supplied to guide

the plaintiff in the purchase of the aircraft." To the extent that Andre is found to be an apparent

agent for Aircraft Solutions, there are issues of fact as to the third element, whether Aircraft

Solutions was negligent in communicating that the aircraft was airworthy. There are issues of

fact as to the remaining elements as well: whether the plaintiff reasonably relied on the false

information and whether the false information proximately caused the plaintiff damages.

Aircraft Solution's motion to dismiss this claim should be denied.

          3.   <u>International Jets and Kilcup's Motion for Summary Dismissal of Negligent<br>        Misrepresentation Claim</u>

      Defendants International Jets and Kilcup's motion to dismiss this claim (Dkt. 107) should

be granted. Plaintiff points to four statements from Kilcup that form the basis of its negligent

misrepresentation claims against Kilcup and International Jets. First, Plaintiff asserts that Kilcup

negligently misrepresented that Aircraft Solutions was a Sierra Industries certified repair shop,

when it was only in the process of becoming certified and never completed the process. Dkt.

112, at 17. Second, Plaintiff asserts that "Kilcup made representations relating to the inspection

by Aircraft Solutions, but he should have known whether Aircraft Solutions would inspect the

aircraft logbooks, inspect both wings of the aircraft, and perform a test flight." *Id.* Third,

Plaintiff maintains that Kilcup misrepresented that a Phase V inspection is sufficient to identify

all airworthy discrepancies. Dkt. 48. Fourth, Plaintiff asserts that Kilcup misrepresented that

"we would pay for repairs" after the delivery flight. *Id.*

      Statement 1 – Aircraft Solutions is a Sierra Industries certified repair shop.

      To the extent that Plaintiff basis his claim on Kilcup's assertion that Aircraft Solutions

was a Sierra Industries certified repair shop, the Defendants' motion should be granted. This

allegation is not a part of the Amended Complaint and so did not "give the defendant fair notice

of what the plaintiff's claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports*

1 *(U.S.), Inc.,* 457 F.3d 963, 968-969 (9th 2006)(dismissing allegations first raised in summary

2 judgment that were not adequately pleaded in complaint).

3     Even if this assertion was in the Amended Complaint, Plaintiff fails to show the third

4 element of negligent misrepresentation by clear, cogent, and convincing evidence - that Kilcup

5 was negligent in obtaining or communicating the false information.  Kilcup was aware that

6 Aircraft Solutions had worked on engines approved by Sierra Industries in the past.  Dkt. 127, at

7 28.  Kilcup testified that Andre told him that they were a Sierra Industries certified shop. Dkt.

8 113-5, at 50.  Plaintiff points to no evidence that Kilcup knew or should have known that this

9 information was false.

10     Plaintiff also makes no showing on the fourth element - that it "relied" on Aircraft

11 Solutions being certified by Sierra Industries.  Plaintiff fails to demonstrate the sixth element-

12 that this statement proximately caused its damages – Aircraft Solutions did not need the Sierra

13 Industries certification to do the Phase V inspection and makes no showing that if Aircraft

14 Solutions had the certification, Plaintiff would not have been damaged.

15     Statement 2 – Aircraft Solutions would/did perform an adequate Phase V and pre-buy

16 inspection.

17     To the extent Plaintiff's misrepresentation claim is based on Kilcup's statements that

18 Aircraft Solutions would provide an adequate Phase V and pre-buy inspection before the

19 inspection was complete, the motion to dismiss this claim should be granted.  Kilcup and

20 International Jets argue that the first element is not met - these representations are related to the

21 future conduct of Aircraft Solutions and so Kilcup was not making a representation of **existing**

22 fact. "Promises of future conduct may support a contract claim.  But failure to perform those

23 promises alone cannot establish the requisite negligence for negligent misrepresentation.  A false

24

representation as to a presently existing fact is a prerequisite to a misrepresentation claim."

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP,* 110 Wash. App. 412, 436 (2002).

Plaintiff asserts that the first element is met - it was entitled to rely on this statement as a

statement of existing fact because Kilcup had "special knowledge," as a salesman citing *Holland*

*Furnace Co. v. Korth,* 43 Wn.2d 618, 622 (1953). Even presuming that *Holland* applies here,

Plaintiff still fails to point to clear, cogent, convincing evidence in the record on the third

element - that Kilcup was "negligent in obtaining or communicating," that Aircraft Solutions

would provide an adequate inspection. Kilcup had prior experience with Aircraft Solutions'

inspections and had no issues. Dkt. 128, at 27. He knew that they worked on engines approved

by Sierra Industries. Dkt. 128, at 27. Aircraft Solutions had no customer complaints about

inspections up to that point. Dkt. 128, at 35. Although Plaintiff points out that Kilcup was given

some updates on the progress of the inspection, there is no evidence that there was anything in

those emails to cause concern. Further, Plaintiff notes that Kilcup had been in the business for

20 years or so and knew Andre, but this does not give rise to the inference that he knew or

should have known that Aircraft Solutions would not do an adequate Phase V or pre-buy

inspection.

To the extent Plaintiff makes its claim against Kilcup related to representations he made

about the adequacy of the inspection by Aircraft Solutions after the inspection was completed,

the motion to dismiss this claim should be granted. There is no evidence in the record that

Kilcup made such a statement.

Statement 3 – A Phase V inspection is sufficient to identify all airworthiness problems.

To the extent that Plaintiff makes a claim against Kilcup for Kilcup's representation that

a Phase V inspection is sufficient to identify all airworthiness problems, the motion to dismiss

1  that claim should be granted.  Plaintiff fails to point to any evidence that this statement is not

2  true.  Further, Plaintiff fails to point to any evidence that Kilcup was negligent in communicating

3  this information.

4       Statement 4 – Kilcup's statements that "we would pay for repairs" after the delivery

5  flight.

6       Although it is unclear, to the extent Plaintiff makes a claim against Kilcup and

7  International Jets for negligent misrepresentation based on his assurances that they would fix the

8  pressurization problem during/after the delivery flight, this claim should be dismissed.  This

9  claim again hinges on the promise of future conduct and so the first element – false

10 representation of an existing fact – is not met.  Unlike the prior statements of future conduct (i.e.

11 Aircraft Solutions will perform the inspection adequately), there is no showing that Kilcup had

12 any "special knowledge" regarding the Defendants' intention to pay for repairs to apply *Holland*.

13 Further, Plaintiff fails to point to clear, cogent, convincing evidence regarding the third element -

14 that Kilcup was "negligent in obtaining or communicating," the information.  This claim should

15 be dismissed.

16       4.  <u>Plaintiff's Motion for Summary Judgment on Negligent Misrepresentation</u>

17       Plaintiff's motion for summary judgment regarding his negligent misrepresentation claim

18 against all Defendants (Dkt. 112) should be denied because Plaintiff fails to show there are no

19 issues of material fact as to element (1) and element (5).  There are issues of fact as to whether

20 the aircraft was airworthy, and so element one, falsity of the information, is not indisputably met.

21 There are also issues of fact as to element five - whether Plaintiff reasonably relied on the

22 representation that the aircraft was airworthy.  Fallang is a sophisticated party and a pilot, who

23 owned two other aircraft.  Fallang set up a business entity - Cozumel - to hold the aircraft.

24

1  Moreover, he was aware that this was a forty year old aircraft at the time of purchase and was

2  aware that the aircraft was experiencing pressurization issues before he closed the deal.

3  Plaintiff's motion should be denied.

4         5.   <u>Conclusion on all the Cross Motions Regarding the Negligent</u>
                       <u>Misrepresentation Claims</u>

5

6        Aircraft Solutions' and Plaintiff's cross motions for summary judgment (Dkts. 101 and

7  112) on Plaintiff's negligent misrepresentation claim asserted against Aircraft Solutions should

8  be denied.  There are issues of fact precluding summary judgment on Plaintiff's claim for

   negligent misrepresentation against Aircraft Solutions.
9
         Plaintiff's cross motion for summary judgment on its negligent misrepresentation claims
10
   against Defendants Andre, Kilcup and International Jets (Dkt. 112) should be denied.
11
   Defendants Andre, Kilcup and International Jets' motions to summarily dismiss Plaintiff's
12
   negligent misrepresentation claims against them (Dkts. 107 and 110) should be granted.  The
13
   negligent misrepresentation claims against Andre, Kilcup and International Jets should be
14
   dismissed.
15
   **D.  CLAIMS FOR VIOLATION OF WASHINGTON'S CONSUMER PROTECTION
16      ACT, RCW 19.86, *ET SEQ*. – ALL DEFENDANTS**

17       Washington's CPA was enacted to protect the public from "unfair or deceptive acts or

18 practices in the conduct of any trade or commerce."  *Indoor Billboard/Washington, Inc. v.*

19 *Integra Telecom of Washington, Inc*., 162 Wn.2d 59, 73, 170 P.3d 10, 17 (2007)(*quoting* RCW

20 19.86.020).  The CPA is to "be liberally construed that its beneficial purposes may be served."

21 *Thornell v. Seattle Serv. Bureau, Inc*., 184 Wn.2d 793, 799 (2015)(*quoting* RCW 19.86.920).

22 "[A] CPA claimant must establish five elements: (1) an unfair or deceptive act or practice (2) in

23

24

trade or commerce (3) that affects the public interest, (4) injury to plaintiff's business or property, and (5) causation." *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 728 (2017).

Defendants' motions for summary dismissal of Plaintiff's CPA claims (Dkts. 101, 107, and 110) should be granted and Plaintiff's cross motion for summary judgment on this claim (Dkt. 112) should be denied. Plaintiff fails to point to sufficient evidence to meet the third element, "affects the public interest."

To meet the third element, a "private plaintiff must show not only that a defendant's practices affect the private plaintiff but that they also have the potential to affect the public interest." *Behnke v. Ahrens*, 172 Wn. App. 281, 290 (2012). "Where the transaction was essentially a private dispute rather than essentially a consumer transaction, it may be more difficult to show that the public has an interest in the subject matter." *Behnke v. Ahrens*, 172 Wn. App. 281, 293, 294 P.3d 729, 736 (2012). Under Washington law,

> The court considers four factors to assess the public interest element when a complaint involves a private dispute: (1) whether the defendant committed the alleged acts in the course of his/her business, (2) whether the defendant advertised to the public in general, (3) whether the defendant actively solicited this particular plaintiff, and (4) whether the plaintiff and defendant have unequal bargaining positions.

*Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 836 (2015). None of these factors is dispositive; Plaintiff need not establish all these factors. *Id.*

While Andre, Aircraft Solutions, Kilcup, and International Jets made the statements for which Plaintiff complains in their course of business and did advertise to the public, *Trujillo,* at 836, "[i]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Behnke,* at 293. This is a private dispute over a used 40 year old aircraft. Plaintiff

1  makes no showing that "additional plaintiffs have or will be injured in exactly the same fashion"

2  by the Defendants' conduct in his case.  The CPA claim should be dismissed.

3  **E.  CLAIM FOR NEGLIGENCE ASSERTED AGAINST AIRCRAFT SOLUTIONS**

4      "In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a

5  duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause."  *Degel v. Majestic*

6  *Mobile Manor, Inc*., 129 Wn.2d 43, 48 (1996).  "The threshold determination of whether a duty

7  exists is a question of law. The existence of a duty may be predicated upon statutory provisions

8  or on common law principles."  *Id.,* at 48-49.

9      Aircraft Solutions owed an independent duty to Plaintiff, even as a third party, to act

10  reasonably.  There are sufficient similarities between this case and *Affiliated FM Insurance, Co.*

11  *v. LTK Consult. Servs., Inc*., 170 Wn.2d 442 (2010) to warrant this finding.  In *Affiliated,* the

12  City of Seattle contracted with an engineering firm to conduct work on the monorail.  *Id.*  Seattle

13  then hired a contractor to run the monorail.  *Id.*  A fire, allegedly caused by the engineering

14  firm's negligence, damaged the contractor's rail cars.  *Id.*  The Washington Supreme Court held

15  that the engineering firm had an independent duty to act reasonably toward the contractor.  *Id.*

16  Aircraft Solutions owed an independent duty to Plaintiff, even as a third party, to act reasonably.

17  Washington law seems clear.  Aircraft Solutions does not make a sufficient showing that the

18  issue should be referred to the Washington State Supreme Court.  There are issues of fact as to

19  whether Aircraft Solutions breached the duty.  The cross motions for summary judgment on this

20  issue (Dkts. 101 and 112) should be denied.

21  **F.  CLAIMS FOR BREACH OF CONTRACT, EXPRESS WARRANTY, IMPLIED**
    **WARRANTY, AND THE DISCLAIMERS AGAINST INTERNATIONAL JETS &**
22  **KILCUP**

23      1.  <u>Breach of Contract</u>

24

1    To assert a claim for breach of contract, a plaintiff must allege the existence of a valid

2  contract, a breach of the contract, and damages. *See Meyers v. State*, 152 Wash. App. 823, 827,

3  828 (2009).

4    There is a valid sales contract between Cozumel and International Jets. The sales contract

5  expressly provided that the aircraft would be airworthy.  There are issues of fact as to whether

6  the aircraft was airworthy at the time Fallang took possession. Plaintiff and Defendants

7  International Jets and Kilcup's cross motions for summary judgment on the breach of contract

8  claim (Dkts. 112 and 107) should be denied.

9      2.  Breach of Express Warranty and Implied Warranty - Disclaimers

10    Plaintiff asserts that International Jets and Kilcup created an express warranty that they

11  would deliver the aircraft in an airworthy condition. Dkt. 112.  Further, Plaintiff maintains that

12  these Defendants created implied warranties of merchantability and fitness for a particular

13  purpose – that the aircraft was safe to fly. *Id.*  Each of these warranties hinges on whether the

14  aircraft was airworthy.  Plaintiff also asserts that International Jets and Kilcup created an express

15  warranty when he stated that a Phase V inspection would be an adequate pre-buy inspection.

16  Dkt. 48.  Plaintiff also maintains that express warranties were created after the closing – that the

17  aircraft would be repaired and they would pay for post-delivery repairs.  Dkt. 112.

18    Defendants International Jets, Kilcup and Andre argue that Plaintiff's claims for breach of

19  express warranty and implied warranty fail as a matter of law given Defendants' enforceable

20  disclaimer of all warranties. Dkts. 107, 127, and 149.  Defendants point to the "as-is" clause in

21  the Sales Agreement and LOI, and the "as-is where-is" clause in the Aircraft Warranty Bill of

22  Sale as the sources for their disclaimers of all warranties. *Id.*

23    Under RCW 62A.2-316 (3)(a)-(c) and (4):

24

(3) Notwithstanding subsection (2) of this section:

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults," or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he or she desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him or her; . . . .

(4) Notwithstanding the provisions of subsections (2) and (3) of this section and the provisions of RCW 62A.2-719, as now or hereafter amended, in any case where goods are purchased primarily for personal, family, or household use and not for commercial or business use, disclaimers of the warranty of merchantability or fitness for particular purpose shall not be effective to limit the liability of merchant sellers except insofar as the disclaimer sets forth with particularity the qualities and characteristics which are not being warranted. Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (RCW 62A.2-718 and RCW 62A.2-719).

Plaintiff's and Defendants International Jets and Kilcup's cross motions for summary judgment on the claims for breach of express and implied warranties relating to the aircraft's airworthiness (Dkts. 107 and 112) should be denied. There are issues of fact as to whether the aircraft was purchased for "primarily for personal, family, or household use and not for commercial or business use" or was purchased for commercial purposes. Even if the aircraft was purchased for commercial use, there are issues of fact regarding the meaning of the language used in the contract.

Even if it was purchased for personal use, there are still issues of fact that would preclude summary judgment. In Washington, warranty disclaimers in a contract involving a "noncommercial entity" "must be both: (1) explicitly negotiated and (2) set forth with particularity." *Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 146 Wn.2d 428, 438 (2002)(*citing Berg v. Stromme*, 79 Wash.2d 184, 196 (1971)). "[T]he presumption leans against the warranty

1  disclaimer." *Id.* "The burden lies on the party seeking to include the disclaimer to prove its

2  legality." *Id.*

3       There are issues of fact as to whether the disclaimers were "explicitly negotiated." *Berg,*

4  at 196.  While Fallang did offer changes to the contracts, it is unclear whether he offered changes

5  to the disclaimers or whether the parties discussed the disclaimers.  Further, as this Court has

6  already held (Dkt. 60), the disclaimers are general in nature and certainly do not "set forth with

7  particularity" the "qualities and characteristics that are not being warranted."  Dkt. 60, at 10.  As

8  to the express warranty that the aircraft would be airworthy, under Washington law,

9       Words or conduct relevant to the creation of an express warranty and words or
        conduct tending to negate or limit warranty shall be construed wherever
10      reasonable as consistent with each other; but subject to the provisions of this
        Article on parol or extrinsic evidence (RCW 62A.2–202) negation or limitation is
11      inoperative to the extent that such construction is unreasonable.

12  *Olmsted v. Mulder*, 72 Wn. App. 169, 177, 863 P.2d 1355, 1359 (1993).  Accordingly, the

13  disclaimers should be construed as consistent with the express warranty of airworthiness.  The

14  disclaimers "make no reference" to the express warranty of airworthiness, and "therefore cannot

15  be read as disclaiming them."  *Id.* (*citing Limited Flying Club, Inc. v. Wood*, 632 F.2d 51, 57 (8th

16  Cir.1980) (8th Cir. 1980)(applying UCC and ruling that where "as is" disclaimer did not address

17  written express warranties contained in airplane logbook—including warranty of airworthiness—

18  "as is" clause construed to disclaim only implied warranties, leaving express warranties intact)).

19  Moreover, there are issues of fact as to airworthiness, and so whether these warranties were

20  breached is an issue of fact.

21       To the extent that Defendants move for summary dismissal of Plaintiff's claims for breach of

22  express warranties based on (1) Kilcup's assertion that a Phase V inspection would be a good

23  pre-buy inspection, and (2) Kilcup's statements after the deal closed that they would repair the

24

aircraft and pay for post-delivery repairs, the motion should be granted. Plaintiff fails to show

that there are issues of material fact as to whether a Phase V inspection would be a good pre-buy

inspection. As to Kilcup's statements after the deal was closed, post-contracting statements

cannot form the basis of a breach of express warranty claim, where no new consideration is

offered. *Fleenor v. Erickson,* 35 Wash.2d 891, 899 (1950). Plaintiff fails to point to any

evidence that new consideration was offered. Plaintiff's claims for breach of express warranties

based on (1) Kilcup's assertion that a Phase V inspection would be a good pre-buy inspection,

and (2) Kilcup's statements after the deal closed that they would repair the aircraft and pay for

post-delivery repairs should be dismissed.

### G. CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST INTERNATIONAL JETS & KILCUP

Breach of fiduciary duty requires the plaintiff to prove: 1) the existence of a duty owed, 2) a

breach of that duty, 3) resulting injury, and 4) the claimed breach proximately caused the injury.

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP,* 110 Wn.App. 412, 433-34 (2002).

"In a fiduciary relationship, one party occupies such a relation to the other party as to justify the

latter in expecting that his interests will be cared for." *Kitsap Bank v. Denley,* 177 Wash.App.

559, 574 (2013). "As a general rule, participants in a business transaction deal at arm's length

and do not enter into a fiduciary relationship." *Id.* Kitsap Bank v. Denley, 177 Wn. App. 559,

574, 312 P.3d 711, 719 (2013).

International Jets and Kilcup's motion to summarily dismiss this claim (Dkt. 107) should be

granted. Plaintiff fails to show that either International Jets or Kilcup owed it a fiduciary duty.

While Plaintiff asserts that Kilcup was more knowledgeable than he was, this alone does not

create a fiduciary relationship between a broker for a seller and a buyer. Kilcup represented

VonJet. Further, that Plaintiff trusted Kilcup does not create a fiduciary duty under Washington

law. *Micro Enhancement,* at 435. There is no evidence that this transaction "involved more trust and confidence than a typical arm's length transaction." Denley, at 575. Plaintiff's motion for summary judgment (Dkt. 112) on this claim should be denied.

## H. CLAIMS FOR FRAUD AND FRAUDULENT INDUCEMENT AGAINST INTERNATIONAL JETS & KILCUP

Washington treats claims for fraud and fraudulent inducement as the same claim. *See e.g., Elcon Const. Inc. v. Eastern Wash. Univ.,* 174 Wn.2d 157, 166 (2012).

> There are nine essential elements of fraud, all of which must be established by clear, cogent, and convincing evidence: (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage.

*Id.* As to the fourth element, the "speaker's knowledge of its falsity," the speaker need not know that statement is false, but can be liable if they make the representation recklessly or carelessly. *Marr v. Cook,* 51 Wash.2d 338 (1957).

International Jets and Kilcup's motion for summary judgment regarding Plaintiff's fraud and fraudulent inducement claims (Dkt. 107) should be granted and Plaintiff's motion (Dkt. 112) denied. Plaintiff fails to show by clear, cogent, and convincing evidence all nine elements of its fraud claims are met. Plaintiff points to the following Kilcup representations as a basis for his fraud claims: 1) "Aircraft Solutions was certified by Sierra Industries to preform maintenance on the aircraft;" 2) "Aircraft Solutions would properly perform the Phase V and pre-buy inspection;" 3) Aircraft Solution's inspection "would be so extensive that it would resolve all airworthy discrepancies;" and 4) the Defendants would pay for the aircraft's post-delivery repairs. Dkt. 112, at 14.

As stated above in the analysis on the negligent misrepresentation claims, Kilcup's statement to Fallang that Aircraft Solutions was Sierra Industries certified, was not included as an allegation in the Amended Complaint, and Plaintiff cannot now seek summary judgment on this claim. *Pickern,* at 968-69. Further, even if it were properly pleaded in the Amended Complaint, Plaintiff points to no evidence supporting the second element - that this representation was material or the fourth element - that Kilcup knew that Aircraft Solutions was not Sierra Industries certified. Kilcup testified that Andre told him that Aircraft Solutions was a Sierra Industries certified service facility. Dkt. 113-5, at 50. There is no evidence that Kilcup made the statement to Fallang recklessly or carelessly. Moreover, as to the seventh element, Plaintiff fails to point to any evidence that Fallang actually relied on this statement.

To the extent that Plaintiff bases his fraud claim against International Jets and Kilcup on Kilcup's statements that "Aircraft Solutions would properly perform the Phase V and pre-buy inspection" and Aircraft Solution's inspection "would be so extensive that it would resolve all airworthy discrepancies," these statements concern future conduct and so do not meet the first fraud element: that the representation of an existing fact. Plaintiff again asserts that it was entitled to rely on these future statements as statements of existing fact because Kilcup had "special knowledge" as a salesman citing *Holland Furnace Co. v. Korth,* 43 Wn.2d 618, 622 (1953). Plaintiff makes no showing on the fourth element (the speaker's knowledge of its falsity) - that is, that Kilcup knew that Aircraft Solutions would not perform an adequate Phase V or pre-buy inspection or resolve all airworthy discrepancies. Plaintiff points to no evidence that Kilcup would reasonably question Aircraft Solution's ability to properly perform the inspection or repairs. Fallang testified that he did not have any reason to believe that Kilcup knew anything more than he did about "what the mechanics at Aircraft Solutions had or hadn't done prior to the

1    time that the aircraft was released on November 21, 2013." Dkt. 113-9, at 86-87.  Further, there

2    is no evidence that Kilcup made these statements recklessly.

3           As to the final basis for Plaintiff's fraud claims against International Jets and Kilcup, that

4    "the Defendants would pay for the aircraft's post-delivery repairs," this is a statement of future

5    conduct, not the representation of an existing fact, and so does not meet the first fraud element.

6    Further, this statement is vague, and the record does not support the notion that any of the

7    Defendants offered to pay for all post-delivery repairs – at most Kilcup stated "they" would

8    cover expenses to repair the pressurization issues and right wing leak.

9           As to the third and fourth elements, "falsity" and the "speaker's knowledge of its falsity,"

10   Plaintiff has failed to point to "clear, cogent, and convincing evidence" that Kilcup's statements

11   were false or that Kilcup knew they were false.  Andre paid for a $1300 part that was installed by

12   Naples Jet Center (even though it did not fix the pressurization problem).  Kilcup attempted to

13   work out a plan with the others to pay to fix the pressurization problem and the issues with the

14   fuel leak from the wing.  He offered to pay $60,000 to Fallang to resolve the issue.  Dkt. 128, at

15   19.  Plaintiff points to no evidence that Kilcup made these statements about future conduct

16   recklessly or without any intention of following through.

17          International Jets and Kilcup's motion for summary judgment regarding Plaintiff's fraud

18   and fraudulent inducement claims (Dkt. 107) should be granted and these claims against Kilcup

19   and International Jets should be dismissed.

20   **I.     PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING**
             **PIERCING INTERNATIONAL JETS' CORPORATE VEIL**
21

22          In order to pierce the corporate veil in Washington, two elements must be established:  (1)

23   "the corporate form must be intentionally used to violate or evade a duty;" and (2) "the fact

24   finder must establish that disregarding the corporate veil is necessary and required to prevent

unjustified loss to the injured party." *Columbia Asset Recovery Grp., LLC v. Kelly*, 177 Wn. App. 475, 486 (2013)(*internal citations omitted*). "Furthermore, a court may pierce the corporate veil under an alter ego theory when the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist." *Id.* (*internal quotations and citations omitted*).

Plaintiff's motion for summary judgment to pierce International Jets' corporate veil and hold Kilcup personally responsible for his conduct here (Dkt. 112) should be denied. Plaintiff fails to show that there are no issues of fact as to whether the corporate form was "intentionally used to violate or evade a duty" or that "disregarding the corporate veil is necessary and required to prevent unjustified loss to the injured party." The motion should be denied.

**J. OTHER MATTERS**

The parties filed several extremely repetitive briefs in relation to these motions. Where possible, parties are encouraged to consolidate their efforts and be concise.

## III.  ORDER

Therefore, it is hereby **ORDERED** that:

- Defendants Kilcup and International Jets' motion to strike (Dkt. 136) **IS DENIED WITHOUT PREJUDICE**;

- Defendant Aircraft Solutions, LLC's Renewed Motion for Summary Judgment (Dkt. 101) **IS**:

    o **GRANTED** as to CPA claim; and

    o **DENIED** as to the negligent misrepresentation and negligence claims;

- Defendant David Kilcup and International Jets, Inc.'s Motion for Summary Judgment (Dkt. 107) **IS**:

o **GRANTED AS TO:** Plaintiff's negligent misrepresentation claims; Plaintiff's CPA claims; Plaintiff's fraud and fraudulent inducement claims; and Plaintiff's breach of express warranties for statements that a Phase V inspection would be a good pre-buy inspection and for statements made after the closing; and

o **DENIED AS TO**: Plaintiff's breach of contract claim; and Plaintiff's breach of express and implied warranties regarding airworthiness;

- Alden Andre's Motion for Summary Judgment (Dkt. 110) **IS GRANTED,** all claims asserted against Alden Andre **ARE DISMISSED**; and

- Plaintiff's Motion for Partial Summary Judgment (Dkt. 112) **IS DENIED**

- This case will proceed on the following:

o Plaintiff's claims for negligent misrepresentation and negligence against Aircraft Solutions, and

o Plaintiff's claims against International Jets and Kilcup for breach of contract and breach of express and implied warranties regarding the aircraft's airworthiness.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 11th day of April, 2017.

ROBERT J. BRYAN
United States District Judge